FILED
CLERK, U.S. DISTRICT COURT

JULY 15 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

1   STEVEN LUTHER (SBN 266570)
    sluther@uselaws.com
2   ANDREW SCHLICHTER (pro hac vice forthcoming)
    aschlichter@uselaws.com
3   JOEL ROHLF (pro hac vice forthcoming)
    jrohlf@uselaws.com
4   SCHLICHTER BOGARD & DENTON, LLP
    100 South Fourth Street, Suite 1200
5   St. Louis, MO 63102
    Telephone: (314) 621-6115
6   Facsimile: (314) 621-5934
    *Counsel for Relator-Plaintiff Mahnaz Amini*

7

8                    **IN THE UNITED STATES DISTRICT COURT**
                    **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
9                              **(Western Division)**

10  UNITED STATES OF AMERICA, STATE
    OF CALIFORNIA, STATE OF INDIANA,
11  STATE OF NEVADA, STATE OF NEW            2:21-CV-05766-CBM-PVCx
    JERSEY, STATE OF NEW YORK, STATE
12  OF TEXAS AND COMMONWEALTH OF             Civil Action No. _____
    VIRGINIA ex rel. MAHNAZ AMINI AND
13  MAHNAZ AMINI, in her individual capacity **FILED UNDER SEAL**
                                             **PURUSANT TO 31 U.S.C.**
14                 *Plaintiffs,*             **§ 3730(b)(2)**

15  v.                                       JURY TRIAL DEMANDED

16  ANTHEM, INC. INGENIORX, INC., BLUE
    CROSS OF CALIFORNIA, ANTHEM
17  INSURANCE COMPANIES, INC.,
    ANTHEM KENTUCKY MANAGED CARE
18  PLAN, INC., EMPIRE HEALTHCHOICE
    HMO, INC., HEALTHPLUS HP, LLC,
19  D/B/A EMPIRE BLUE CROSS
    BLUESHIELD HEALTH PLUS,
20  COMMUNITY CARE HEALTH PLAN OF
    NEVADA, INC., HEALTHKEEPER, INC.,
21  AMERIGROUP TEXAS, INC.,
    AMERIGROUP NEW JERSEY, INC.,
22  ANTHEM HEALTH PLANS, INC.,
    EMPIRE HEALTHCHOICE ASSURANCE,
23  INC., MATTHEW THORNTON HEALTH
    PLAN, INC., COMMUNITY INSURANCE
24  COMPANY, HMO COLORADO, INC.,
    BLUE CROSS BLUE SHIELD
25  HEALTHCARE PLAN OF GEORGIA,
    FREEDOM HEALTH, INC., HEALTHSUN
26  HEALTH PLANS, INC., SIMPLY HEALTH
    CARE PLANS, INC., OPTIMUM HEALTH
27  CARE, INC., AMERIGROUP
    COMMUNITY CARE OF NEW MEXICO,
28  INC., BLUE CROSS OF CALIFORNIA
    PARTNERSHIP PLAN, INC., ANTHEM

                                                        SEALED COMPLAINT

HEALTH PLANS OF MAINE, INC.,
AMERICA'S 1ST CHOICE OF SOUTH
CAROLINA, INC., ANTHEM BLUE
CROSS LIFE AND HEALTH INSURANCE
COMPANY, COMPCARE HEALTH
SERVICE INSURANCE CORPORATION,
UNICARE LIFE & HEALTH INSURANCE
COMPANY, ANTHEM HEALTH PLANS
OF NEW HAMPSHIRE, INC.,
AMERIGROUP WASHINGTON, INC.,
CVS HEALTH, CORP.; AND
CAREMARKPCS HEALTH, LLC

*Defendants.*

**(DO NOT SERVE)**

1.     This is a qui tam action brought by Relator-Plaintiff Mahnaz Amini to recover damages and civil penalties on behalf of the United States of America (the "United States" or the "Government"), the State of California ("California"), the State of Indiana ("Indiana"), the State of Nevada ("Nevada"), the State of New Jersey ("New Jersey"), the State of New York ("New York"), the State of Texas ("Texas") and the Commonwealth of Virginia ("Virginia") (collectively, the "Qui Tam States"), arising from false and/or fraudulent statements, records, and claims made and/or caused to be made by Anthem, Inc., Anthem Insurance Companies, Inc., Kentucky Managed Care Plan, Inc., Blue Cross of California, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue Cross BlueShield Health Plus, Community Care Health Plan of Nevada, Inc., HealthKeepers, Inc., Amerigroup Texas, Inc., Amerigroup New Jersey, Inc., Anthem Health Plans, Inc., Empire Healthchoice Assurance, Inc., Matthew Thornton Health Plan, Inc., Community Insurance Company, HMO Colorado, Inc., Blue Cross Blue Shield HealthCare Plan of Georgia, Freedom Health, Inc., Healthsun Health Plans, Inc., Simply Health Care Plans, Inc., Optimum Health Care, Inc., Amerigroup Community Care of New Mexico, Inc., Blue Cross of California Partnership Plan, Inc., Anthem Health Plans of Maine, Inc., America's 1st Choice of South Carolina, Inc., Anthem Blue Cross Life and Health Insurance

- 2 -

1   Company, Compcare Health Service Insurance Corporation, Unicare Life & Health

2   Insurance Company, Anthem Health Plans of New Hampshire, Inc., Amerigroup

3   Washington, Inc., IngenioRx, Inc., CVS Health Corporation, and CaremarkPCS

4   Health, LLC (collectively, "Defendants") and/or their agents and employees in

5   violation of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. (the "FCA"),

6   the California False Claims Act, Cal. Gov't Code §§ 12650 et seq. (the "California

7   FCA"), the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind.

8   Code §§ 5-11-5.7-1 et seq. (the "Indiana FCA"), the Nevada False Claims Act,

9   Nev. Rev. Stat. §§ 357.010 et seq. (the "Nevada FCA"), the New Jersey False

10  Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 et seq. (the "New Jersey FCA"), the New

11  York False Claims Act, N.Y. State Fin. Law §§ 187 et seq. (the "New York FCA"),

12  the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 et

13  seq. (the "Texas FCA"), and the Virginia Fraud Against Taxpayers Act, Va. Code

14  §§ 8.01-216.1 et seq. (the "Virginia FCA"). Ms. Amini also seeks damages against

15  Defendant IngenioRx, Inc. ("IngenioRx") under 31 U.S.C. § 3730(h) arising from

16  its retaliatory conduct toward her for reporting the conduct underlying Defendants'

17  FCA violations.

18      2.      Defendants violated the FCA and the above-referenced state false

19  claims acts by ignoring and/or failing to comply with Medicare and Medicaid

20  regulations and contractual provisions related to pharmacy credentialing and

21  recredentialing – "increasingly important[t]" processes that protect those who

22  depend on pharmacies to (i) safely discharge and, in many cases, administer

23  medicines; and (ii) provide accurate instruction, information, advice, and care

24  regarding prescription drug treatments.[1] Pharmacy credentialing and recredentialing

25  is a "primary source verification process"[2] that safeguards those who rely on

26  ───────────────

27  [1] Rouse, *et al.*, Council on Credentialing in Pharmacy, *Credentialing and privileging of pharmacists: a resource paper from the Council on Credentialing in Pharmacy*, 71(21) Am. J. Health Sys. Pharmacy e109-e118 (2014).

28  [2] Christel Svingen, PharmD, BCPS, NCPS, *Clinical Pharmacist Credentialing and*

- 3 -

pharmacies and/or require prescription drug treatments from "a number of persistent and ongoing incursions, each with potentially serious health consequences."[3] As pharmacists increasingly engage in direct patient care, "[c]redentialing is gaining in importance[.]"[4]

3.       Ms. Amini, in her capacity as IngenioRx's Oversight Lead for Pharmacy Audit and Credentialing, uncovered Defendants' compliance failures following a January 2020 audit. During the course of her audit, Ms. Amini discovered that CVS Health Corporation, and CaremarkPCS Health, LLC ("the CVS Defendants") – which performed pharmacy benefits services for IngenioRx and Anthem, Inc. ("Anthem") – had (i) failed to properly credential 90% of the audited pharmacies, as Medicare and Medicaid regulations require; and (ii) failed to perform any recredentialing of network pharmacies, as Medicare and Medicaid regulations likewise require.

4.       Ms. Amini subsequently learned that Anthem and IngenioRx failed to oversee the CVS Defendants' credentialing process or report violations of applicable regulations to federal and state regulatory bodies, and that Anthem falsely certified compliance with Medicare and Medicaid regulations in submitting claims for payment to the United States and the Qui Tam States. Defendants' failure to develop, implement, and enforce a pharmacy credentialing and recredentialing program has continued, and poses a direct risk to the health and safety of millions of Americans who rely on the pharmacies in Defendants' network.

5.       Despite Ms. Amini's concerted efforts to resolve the serious violations that she uncovered, Defendants ignored her concerns and refused to remedy their

_Privileging: A Process for Ensuring High-Quality Patient Care_, 36 Fed Practitioner 155 (Apr 2019).
[3] The PEW Charitable Trusts, _Implementing a Pharmaceutical Serialization and Traceability System in the United States: Stakeholder Perspectives and Investments_ § 1.2 (2014).
[4] Sun Lee, _et al._, _Credentialing in Pharmacy Practice: Examining Pharmacist Views and Perceptions_, 10(4) Innovations in Pharmacy 1 (2019).

- 4 -

violations or bring their pharmacy credentialing and recredentialing programs into compliance with governing regulations. When Ms. Amini persisted in her attempts to resolve Defendants' violations, she was subjected to harassment and intimidation by her supervisors and, ultimately, termination of her employment. Ms. Amini is aware of no evidence that any Defendant has resolved the violations she uncovered, or that the significant risks to patient health and safety posed by Defendants' compliance failures have been mitigated.

## PARTIES

### I. Realtor-Plaintiff Mahnaz Amini

6.      Relator-Plaintiff Mahnaz Amini is a resident of Chesterfield, Missouri. Prior to accepting a role with IngenioRx in February 2019, Ms. Amini was a long-time resident of the Central District of California.

7.      Ms. Amini is a regulatory expert in the healthcare industry. Ms. Amini spent approximately twelve years working for Anthem in Los Angeles, California, where she developed into a subject-matter expert on Medicaid regulatory issues.

8.      In February 2019, Ms. Amini joined IngenioRx as a Business Consultant in charge of pharmacy oversight. In this role, Ms. Amini was responsible for conducting oversight of pharmacy audits, credentialing, and recredentialing.

9.      As discussed in detail below, Ms. Amini was terminated from IngenioRx in October 2020 in retaliation for her internal reporting of Defendants' failure to comply with the terms of Medicare and Medicaid regulations and government contracts.

### II. Defendants

#### A. The Anthem Defendants

10.      Anthem is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Anthem is one of the largest health benefits companies in

1   the United States. It serves approximately 43 million medical members through
2   affiliated health plans as of December 31, 2020.

3        11.    Anthem, through various subsidiaries, offers plans that provide
4   services both to Medicare and Medicaid participants. Approximately 20% of
5   Anthem's customers are in Medicaid plans and 6% are in Medicare plans.

6        12.    Anthem Insurance Companies, Inc., is an Indiana corporation with its
7   principal place of business in Indianapolis, Indiana. Anthem Insurance Companies,
8   Inc. is a subsidiary of Anthem. Anthem Insurance Companies, Inc., contracts with
9   Indiana to provide managed care coverage for Medicaid participants in Indiana and
10  with the United States to provide pharmacy coverage under Medicare.

11       13.    Anthem Kentucky Managed Care Plan, Inc., is a Kentucky corporation
12  with its principal place of business in Louisville, Kentucky. Anthem Kentucky
13  Managed Care Plan, Inc., is a subsidiary of Anthem. Anthem Kentucky Managed
14  Care Plan, Inc., contracts with Kentucky to provide managed care coverage for
15  Medicaid participants in Kentucky.

16       14.    Blue Cross of California is a California corporation with its principal
17  place of business in Woodland Hills, California. Blue Cross of California is a
18  subsidiary of Anthem. Blue Cross of California contracts with California to provide
19  managed care coverage for Medicaid participants in California, including in Los
20  Angeles County, and with the United States to provide pharmacy coverage under
21  Medicare.

22       15.    Empire HealthChoice HMO, Inc., is a New York corporation with its
23  principal place of business in New York, New York. Empire HealthChoice HMO,
24  Inc., is a subsidiary of Anthem. Empire HealthChoice HMO, Inc., contracts with
25  New York to provide managed care coverage for Medicaid participants in New
26  York and with the United States to provide pharmacy coverage under Medicare.

27       16.    Defendant HealthPlus HP, LLC, d/b/a Empire Blue Cross BlueShield
28  HealthPlus, is a New York corporation with its principal place of business in

- 6 -

1   Indianapolis, Indiana. HealthPlus HP, LLC, is a subsidiary of Anthem. HealthPlus

2   HP, LLC, contracts with New York to provide managed care coverage for Medicaid

3   participants in New York.

4        17.   Defendant Community Care Health Plan of Nevada, Inc., is a Nevada

5   corporation with its registered agent in Carson City, Nevada. Community Care

6   Health Plan of Nevada, Inc., is a subsidiary of Anthem. Community Care Health

7   Plan of Nevada, Inc., contracts with Nevada to provide managed care coverage for

8   Medicaid participants in Nevada.

9        18.   HealthKeepers, Inc., is a Virginia corporation with its principal place

10  of business in Richmond, Virginia. HealthKeepers, Inc., is a subsidiary of Anthem.

11  HealthKeepers, Inc., contracts with Virginia to provide managed care coverage for

12  Medicaid participants in Virginia and with the United States to provide pharmacy

13  coverage under Medicare.

14       19.   Amerigroup Texas, Inc., is a Texas corporation with its principal place

15  of business in Dallas, Texas. Amerigroup Texas, Inc., is a subsidiary of Anthem.

16  Amerigroup Texas, Inc., contracts with Texas to provide managed care coverage

17  for Medicaid participants in Texas and with the United States to provide pharmacy

18  coverage under Medicare.

19       20.   Amerigroup New Jersey, Inc., is a New Jersey corporation with its

20  principal place of business in Iselin, New Jersey. Amerigroup New Jersey, Inc., is a

21  subsidiary of Anthem. Amerigroup New Jersey, Inc., contracts with New Jersey to

22  provide managed care coverage for Medicaid participants in New Jersey and with

23  the United States to provide pharmacy coverage under Medicare.

24       21.   Anthem Health Plans, Inc., is a Connecticut corporation with its

25  principal place of business in Wallingford, Connecticut. Anthem Health Plans, Inc.,

26  is a subsidiary of Anthem. Anthem Health Plans, Inc., contracts with the United

27  States to provide pharmacy coverage under Medicare.

28  ///

SEALED COMPLAINT

22. Empire Healthchoice Assurance, Inc., is a New York corporation with its principal place of business in New York, New York. Empire Healthchoice Assurance, Inc., is a subsidiary of Anthem. Empire Healthchoice Assurance, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

23. Matthew Thornton Health Plan, Inc., is a New Hampshire corporation with its principal place of business in Manchester, New Hampshire. Matthew Thornton Health Plan, Inc., is a subsidiary of Anthem. Matthew Thornton Health Plan, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

24. Community Insurance Company is an Ohio corporation with its registered agent in Columbus, Ohio. Community Insurance Company is a subsidiary of Anthem. Community Insurance Company contracts with the United States to provide pharmacy coverage under Medicare.

25. HMO Colorado, Inc., is a Colorado corporation with its principal place of business in Denver, Colorado. HMO Colorado, Inc., is a subsidiary of Anthem. HMO Colorado, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

26. Blue Cross Blue Shield Healthcare Plan of Georgia is a Georgia corporation with its principal place of business in Indianapolis, Indiana. Blue Cross Blue Shield Healthcare Plan of Georgia is a subsidiary of Anthem. Blue Cross Blue Shield Healthcare Plan of Georgia contracts with the United States to provide pharmacy coverage under Medicare.

27. Freedom Health, Inc., is a Florida corporation with its principal place of business in Tampa, Florida. Freedom Health, Inc., is a subsidiary of Anthem. Freedom Health, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

28. Healthsun Health Plans, Inc., is a Florida corporation with its principal place of business in Miami, Florida. Healthsun Health Plans, Inc., is a subsidiary of

- 8 -

Anthem. Healthsun Health Plans, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

29.    Simply Healthcare Plans, Inc., is a Florida corporation with its principal place of business in Miami, Florida. Simply Healthcare Plans, Inc., is a subsidiary of Anthem. Simply Healthcare Plans, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

30.    Optimum Healthcare, Inc., is a Florida corporation with its principal place of business in Tampa, Florida. Optimum Healthcare, Inc., is a subsidiary of Anthem. Optimum Healthcare, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

31.    Amerigroup Community Care of New Mexico, Inc., is a New Mexico corporation with its principal place of business in Espanola, New Mexico. Amerigroup Community Care of New Mexico, Inc., is a subsidiary of Anthem. Amerigroup Community Care of New Mexico, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

32.    Blue Cross of California Partnership Plan, Inc., is a California corporation with its principal place of business in Woodland Hills, California. Blue Cross of California Partnership Plan, Inc., is a subsidiary of Anthem. Blue Cross of California Partnership Plan, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

33.    Anthem Health Plans of Maine, Inc., is a Maine corporation with its registered agent in Augusta, Maine. Anthem Health Plans of Maine, Inc., is a subsidiary of Anthem. Anthem Health Plans of Maine, Inc., contracts with the United States to provide pharmacy coverage under Medicare.

34.    America's 1st Choice of South Carolina, Inc., is a South Carolina corporation with its registered agent in Columbia, South Carolina. America's 1st Choice of South Carolina, Inc., is a subsidiary of Anthem. America's 1st Choice of South Carolina, Inc., contracts with the United States to provide pharmacy coverage

1    under Medicare.

2         35.    Anthem Blue Cross Life and Health Insurance Company is a

3    California corporation with its principal place of business in Woodland Hills,

4    California. Anthem Blue Cross Life and Health Insurance Company is a subsidiary

5    of Anthem. Anthem Blue Cross Life and Health Insurance Company contracts with

6    the United States to provide pharmacy coverage under Medicare.

7         36.    Compcare Health Services Insurance Corporation is a corporation with

8    its principal place of business in Madison, Wisconsin. Compcare Health Services

9    Insurance Corporation is a subsidiary of Anthem. Compcare Health Services

10   Insurance Corporation contracts with the United States to provide pharmacy

11   coverage under Medicare.

12        37.    Unicare Life & Health Insurance Company is an Indiana corporation

13   with its principal place of business in Indianapolis, Indiana. Unicare Life & Health

14   Insurance Company is a subsidiary of Anthem. Unicare Life & Health Insurance

15   Company contracts with the United States to provide pharmacy coverage under

16   Medicare.

17        38.    Anthem Health Plans of New Hampshire, Inc., is a New Hampshire

18   corporation with its principal place of business in Manchester, New Hampshire.

19   Anthem Health Plans of New Hampshire, Inc., is a subsidiary of Anthem. Anthem

20   Health Plans of New Hampshire, Inc., contracts with the United States to provide

21   pharmacy coverage under Medicare.

22        39.    Amerigroup Washington, Inc., is a Washington corporation with its

23   principal place of business in Virginia Beach, Virginia. Amerigroup Washington,

24   Inc., is a subsidiary of Anthem. Amerigroup Washington, Inc., contracts with the

25   United States to provide pharmacy coverage under Medicare.

26        40.    IngenioRx is an Indiana corporation with its principal place of

27   business in Indianapolis, Indiana. IngenioRx is a wholly owned subsidiary of

28   Anthem.

SEALED COMPLAINT

41.     Anthem launched IngenioRx in May 2019 to provide pharmacy benefits management ("PBM") services for all of its affiliate health plans, including its government-funded plans. Included in the services that IngenioRx has subcontracted to provide Anthem-affiliated plans are credentialing and recredentialing of pharmacy providers.

42.     Collectively, Anthem and its subsidiaries are referred to as the "Anthem Defendants."

**B. CVS Defendants**

43.     CVS Health Corporation ("CVS") is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. CVS and its subsidiaries operate almost 10,000 retail pharmacies, 1,100 walk-in medical clinics, and a pharmacy benefit manager with 105 million plan members. Following its acquisition of Aetna in 2018, CVS serves over 34 million people through health benefits plans, including Medicare Advantage Plans, standalone Medicare Part D plans, and Medicaid plans.

44.     Caremark PCS Health, LLC ("Caremark PCS") is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island. Caremark PCS is a subsidiary of CVS.

45.     In October 2017, Caremark PCS entered into a contractual relationship with IngenioRx to provide certain services for IngenioRx, including claims processing and prescription fulfillment. Caremark PCS also agreed to conduct credentialing and recredentialing of network pharmacies on behalf of IngenioRx (which itself has an agreement to perform those services for Anthem), subject to oversight by IngenioRx.

46.     CVS and Caremark PCS are collectively referred to as the "CVS Defendants."

///

///

- 11 -

1

## JURISDICTION AND VENUE

2    47.    **Subject-matter jurisdiction.** This Court has jurisdiction over the

3    subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4    31 U.S.C. § 3732(a) confers jurisdiction on this Court in connection with actions

5    brought pursuant to 31 U.S.C. §§ 3729 and 3730, and 31 U.S.C. § 3732(b) confers

6    jurisdiction over related state law claims.

7    48.    **Venue.** This District is the proper venue because Defendants regularly

8    conduct business in this District, including by providing managed care services to

9    California and the United States here, and/or made or caused the submission of

10   false claims from this District.

11   49.    This action is not precluded by any provision of the False Claims Act's

12   jurisdictional bar.

13   50.    There have been no statutorily relevant public disclosures of the

14   "allegations or transactions" described in this Complaint.

15   51.    Contemporaneously with the filing of this Complaint, Ms. Amini has,

16   pursuant to 31 U.S.C. § 3730(b)(2), served a copy of the Complaint and a written

17   disclosure of substantially all material evidence and information that Ms. Amini

18   possesses upon the United States.

19

## FCA STANDARDS

20   52.    The FCA was originally enacted in 1863 and was substantially

21   amended in 1986 by the False Claims Amendments Act. The FCA prohibits, among

22   other things, (1) knowingly presenting, or causing to be presented, a false or

23   fraudulent claim for payment or approval; and (2) knowingly making or using, or

24   causing to be made or used, a false or fraudulent record or statement material to a

25   false or fraudulent claim or (3) conspiring to commit a violation of the statute.

26   31 U.S.C. §§ 3729(a)(1)(A), (B), and (C).

27   53.    In 2009, Congress amended the FCA to clarify that a "claim" includes

28   "any request or demand, whether under a contract or otherwise, for money or

- 12 -

1  property and whether or not the United States has title to the money or property that

2  (i) is presented to an officer, employee, or agent of the United States; or (ii) is made

3  to a contractor, grantee, or other recipient, if the money or property is to be spent or

4  used on the Government's behalf or to advance a Government program or

5  interest[.]" 31 U.S.C. § 3729(b)(2).

6       54.    The FCA further provides that any person who violates the FCA "is

7  liable to the United States for a civil penalty of not less than $5,000 and not more

8  than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of

9  1990 . . . , plus 3 times the amount of damages which the Government sustains

10 because of the act of that person." *Id.* § 3729(a)(1). The Federal Civil Penalties

11 Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461, increased

12 the civil penalty as relevantly follows to between $11,665 and $23,331 for

13 violations occurring after November 2, 2015. 28 C.F.R. §§ 85.3, 85.5.

14      55.    The FCA provides that "the terms 'knowing' and 'knowingly' – (A)

15 mean that a person, with respect to information – (i) has actual knowledge of the

16 information; (ii) acts in deliberate ignorance of the truth or falsity of the

17 information; or (iii) acts in reckless disregard of the truth or falsity of the

18 information; and (B) require no proof of specific intent to defraud." 31 U.S.C.

19 § 3729(b)(1).

20      56.    The FCA provides that "the term 'material' means having a natural

21 tendency to influence, or be capable of influencing, the payment or receipt of

22 money or property." *Id.* § 3729(b)(4).

23      57.    Many states have passed false claims laws that largely mirror the FCA.

24 The state false claims laws apply to the applicable state's portion of the Medicaid

25 losses caused by false or fraudulent Medicaid claims, which are jointly funded by

26 the state and federal governments. Defendants' acts alleged herein also constitute

27 violations of the California FCA, Cal. Gov't Code §§ 12650 et seq., the Indiana

28 FCA, Ind. Code §§ 5-11-5.7-1 et seq., the Nevada FCA, Nev. Rev. Stat. §§ 357.010

- 13 -

1  et seq., the New Jersey FCA, N.J. Stat. Ann. §§ 2A:32C-1 et seq., the New York

2  FCA, N.Y. State Fin. Law §§ 187 et seq., Texas FCA, Tex. Hum. Res. Code Ann.

3  §§ 36.001 et seq., and the Virginia FCA, Va. Code §§ 8.01-216.1 et seq.

4       58.    The FCA and applicable state false claims act laws allow any person

5  with information about a false claim (i.e., a relator) to bring an action in the name

6  of the United States and/or the states. 31 U.S.C. § 3730(b)(1); Cal. Gov't Code

7  § 12652(c); Ind. Code § 5-11-5.7-4; Nev. Rev. Stat. § 357.080; N.J. Stat. Ann.

8  § 2A:32C-5(b); N.Y. State Fin. Law § 190(2); Tex. Hum. Res. Code Ann. § 36.101;

9  Va. Code § 8.01-216.5.

10  **BACKGROUND FACTS AND REGULATIONS**

11  **I.**   **Medicare and Medicaid**

12       **A. Medicare**

13       59.    Medicare is a federally funded health insurance program that provides

14  health insurance for people over the age of 65 years old and/or with certain

15  disabilities or conditions. *See* 42 U.S.C. §§ 426 & 426A. The United States

16  Department of Health and Human Services, Centers for Medicare and Medicaid

17  Services ("CMS") oversee Medicare.

18       60.    Medicare coverage is divided into four parts. Parts A and B provide

19  coverage directly to Medicare enrollees for inpatient hospital services, post-hospital

20  nursing facility care, physician services, and certain other medical services. *See* 42

21  U.S.C. §§ 1395c–1395i-4; 1395k, 1395l, 1395x(s). This is commonly referred to as

22  the "fee-for-service model," pursuant to which CMS makes direct payments to

23  providers for medical services.

24       61.    Parts C and D operate under a "managed care model." Under this

25  model, CMS pays private insurers a fixed amount per beneficiary each month to

26  ensure that Medicare enrollees receive healthcare.

27  ///

28  ///

- 14 -

62.     Part C plans are referred to as Medicare Advantage ("MA") plans. MA plans cover the hospital, physician and other medical services traditionally covered by Parts A and B.

63.     Part D allows Medicare enrollees the option of obtaining government-subsidized insurance coverage for prescription drugs. Part D is often included in MA plans and is frequently sold separately to enrollees in Parts A and B or enrollees in a MA plan without prescription drug coverage.

**B. Medicaid**

64.     Medicaid is designed to provide medical services, medical equipment, and prescription drugs to needy individuals. Costs are shared by the United States and the states.

65.     CMS oversees Medicaid jointly with an oversight agency in each state.

66.     Under Medicaid, the United States government directly pays monies to states based upon certain formulas. States, in turn, pay for medical care for covered individuals.

67.     Medicaid funding from the United States government also includes support for Medicare Savings Programs to assist qualifying Medicare beneficiaries to pay premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs are the Qualified Medicare Beneficiary Program, 42 U.S.C. § 1396d(p)(1), the Specified Low-Income Medicare Beneficiary Program, 42 U.S.C. § 1396a(a)(10)(E)(iii), the Qualifying Individual Program, 42 U.S.C. § 1396a(a)(10)(E)(iv), and the Qualified Disabled and Working Individuals Program, 42 U.S.C. § 1396d(s).

68.     Medicaid may serve as the primary insurer or as a secondary insurer (i.e., when Medicare or private insurance provides primary coverage).

69.     Each state adopts its own plan and regulations for its program. Medicaid sets forth requirements for the state programs to meet in order to receive federal funding.

- 15 -

70.     As with Medicare Parts C and D, states can administer Medicaid by hiring private insurers, such as the Anthem Defendants, to provide managed care delivery systems. *See* 42 U.S.C. §§ 1315, 1396n, 1396u-2.

**II.     Contractual Requirements and Regulations Related to Credentialing**

**A. Medicare Credentialing Requirements**

71.     To offer a MA or Part D plan, managed care providers must agree to contracts with CMS that require compliance with all Medicare laws and regulations. *See* 42 C.F.R. § 422.504 ("The MA organization agrees to comply with all the applicable requirements and conditions set forth in this part and in general instructions."); *id.* § 423.505 ("The Part D plan sponsor agrees to . . . [a]ll the applicable requirements and conditions set forth in this part and in general instructions.").

72.     As a "material" contractual term, all MA providers must agree "[t]o comply with all applicable provider and supplier requirements in subpart E of this part, including provider certification requirements[.]" *Id.* § 422.504(a)(6). Subpart E of the MA regulations, in turn, requires an MA managed care provider to "follow a documented process with respect to providers" to determine, at regular intervals or every three years, that providers are licensed to operate in the state they provide services in, their disciplinary status, their eligibility for payment under Medicare and other information. *Id.* § 422.204(b). This process is referred to as "credentialing" and "recredentialing." *Id.*

73.     Similarly, providers of Part D plans must agree to "[o]perate quality assurance . . . as required under subpart D" of the Part D regulations. *Id.* § 423.505(b)(6). The quality assurance provisions require a plan sponsor to obtain representations from all network providers, through credentialing, that they "comply with minimum standards for pharmacy practice as established by the States." *Id.* § 423.153(c)(1).

///

- 16 -

74.     Additionally, as a condition for monthly payment, MA plans are required to submit risk adjustment data for validation and certify "the accuracy, completeness, and truthfulness of relevant data that CMS requests." 42 C.F.R. § 422.504(l). Among the things that CMS requires to validate risk adjustment data is that "there are valid credentials and/or a valid physician specialty documented on the record."[5]

75.     Similarly, Part D plan sponsors "must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment." *Id.* § 423.505(k)(1).

**B. Medicaid Credentialing Requirements**

76.     CMS regulations require that all state Medicaid agencies must adopt a credentialing process for Medicaid providers. 42 C.F.R. § 455.410.

77.     The credentialing and recredentialing process that state Medicaid agencies implement must "[h]ave a method for verifying that any provider purporting to be licensed in accordance with the laws of any State is licensed by such State" and confirm that the license has not expired. *Id.* § 455.412. Additionally, as part of the credentialing process, state Medicaid agencies must ensure that a criminal background check is completed for all providers and establish risk levels for providers who have an increased financial risk of fraud. *Id.* § 455.343.

78.     State Medicaid agencies must also determine the exclusion status of all providers (including pharmacies), persons with ownership or control of a provider, or managing employees of a provider "through routine checks of Federal databases." *Id.* § 455.436. State Medicaid agencies must also require providers to

---

[5] CMS, Risk Adjustment Data Validation (RADV) Medical Record Check List and Guidance, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Checklist.pdf (last visited July 11, 2021).

- 17 -

1    make various disclosures about their ownership and control, *id.* §§ 455.104 –

2    455.107, and must conduct further screening procedures for "moderate" and "high"

3    risk providers, including on-site visits and fingerprinting, *id.* § 455.450. "The State

4    Medicaid agency must revalidate the enrollment of all providers regardless of

5    provider type at least every 5 years." *Id.* § 455.414.

6         79.    CMS requires a state Medicaid agency to terminate or deny enrollment

7    to any provider that "did not submit timely and accurate information and cooperate

8    with any screening methods"; has been convicted of a criminal offense related to

9    Medicare, Medicaid, or a title XXII program in the last ten years (or is owned by a

10   person who has been convicted of such an offense); has been denied enrollment or

11   terminated by any other state or under Medicare; fails to submit fingerprints; or

12   fails to permit access to provider locations. *Id.* § 455.416.

13        80.    If a state uses a managed care delivery system, CMS requires that each

14   managed care organization "must follow a documented process for credentialing

15   and recredentialing of network providers." 42 C.F.R. § 438.214(b)(2).

16        81.    During the relevant time period, the Anthem Defendants provided

17   Medicaid managed care services to California, Indiana, Kentucky, Nevada, New

18   Jersey, New York, Texas, Virginia, and Wisconsin.[6]

19                    1. *California Medicaid Credentialing Requirements*

20        82.    California's Medicaid program ("Medi-Cal") includes managed care

21   services provided by private insurers, including the Anthem Defendants, to

22   enrollees. Cal. Welf. & Inst. Code § 14093.05.

23        83.    Pharmacies and other Medi-Cal providers must provide extensive

24   information in order to provide services under the program. Specifically,

25   pharmacies are required to identify: (1) whether they meet the retail pharmacy

26   requirements of the regulations; (2) their National Council of Prescription Drug

27

28   _____

[6] Wisconsin uses a fee-for-service model rather than a managed care model for the
pharmaceutical coverage at issue, so is not discussed below.

- 18 -

1   Programs number; (3) their Drug Enforcement Agency registration certificate,

2   including expiration date; (4) their California State Board of Pharmacy permit

3   number and effective date; (5) the name of the pharmacist-in-charge at the business

4   address; (6) the driver's license or identification card number of the pharmacist-in-

5   charge; and (7) the license number of the pharmacist-in-charge; and other

6   information. Cal. Code Regs. tit. 22, § 51000.30.

7        84.     Additionally, Medi-Cal requires disclosure of all the ownership and

8   conflict-of-interest information required by CMS, information regarding the

9   provider's prior participation in Medi-Cal and other Medicaid programs, and

10  whether any license of the provider (or the pharmacist-in-charge) has been revoked

11  or suspended. *Id.* § 51000.35.

12       85.     Providers are required to report any addition or change to previously

13  submitted information within 35 days. *Id.* § 51000.40. A provider will be

14  immediately deactivated if its license is suspended or it fails to meet the application

15  requirements. *Id.* § 51000.53.

16       86.     A managed care provider must ensure that all providers with which it

17  subcontracts are "meeting the standards for participation as a provider of health

18  care services under Medi-Cal." *Id.* § 53242. Each facility in a managed care plan is

19  also required to comply with all licensing standards. *Id.* § 53230.

20       87.     Medi-Cal's standard contract terms require that a managed care plan

21  have a credentialing process for all providers, including validation of proper

22  licensing.[7]

23  ///

24  ///

25

26  [7] California Department of Health Care Services, Medi-Cal Managed Care
    Boilerplate Contracts, *available at* https://www.dhcs.ca.gov/provgovpart/Pages/

27  MMCDBoilerplateContracts.aspx (all containing a provision stating "Contractor
    shall implement and maintain written policies and procedures concerning the initial

28  credentialing, recredentialing, recertification, and reappointment of Network
    Providers, developed by the Department in accordance with 42 CFR 438.214 and
    APL 16-012 . . .") (last visited July 11, 2021).

- 19 -

1         2. *Indiana Medicaid Credentialing Requirements*

2         88.     Indiana offers Medicaid benefits through managed account service

3    providers, including the Anthem Defendants. *See, e.g.*, Ind. Code 12-15-12-22.

4         89.     All providers for Indiana Medicaid must be "duly licensed, registered,

5    or certified by the appropriate professional regulatory agency," complete a provider

6    agreement, and maintain its license. 405 Ind. Admin. Cod. § 1-1.4-3.

7         90.     In Indiana, a "managed care organization shall maintain and monitor

8    an adequate network of providers." *Id.* § 10-8-3.

9         91.     The Anthem Defendants' contract with Indiana provides that the

10   Anthem Defendants "shall be responsible for meeting all provider screening and

11   enrollment requirements described in 42 CFR 455 Subpart E."[8] The Anthem

12   Defendants are "prohibited from contracting with providers who have been

13   excluded or have had owners or operators (i.e., those with a controlling interest)

14   excluded from the Federal Government or by the State's Medicaid program for

15   fraud or abuse" and must conduct exclusion and debarment screening.[9] The Anthem

16   Defendants must check the list of prohibited and excluded providers from both the

17   state and federal government every 30 days.[10] The Anthem Defendants must

18   "maintain a list of all rendering providers of providers enrolled, even if rendering

19   providers are not required to enroll with IHCP."[11]

20        92.     Under their contract with Indiana, the Anthem Defendants must

21   additionally require in every provider agreement that the provider "be duly licensed

22   in accordance with the appropriate state licensing board and remain in good

23   standing with said board" and "[i]nclude a termination clause stipulating that [the

24   Anthem Defendants] shall terminate [their] contractual relationship with the

25

26   _____

     [8] Amendment #3 to Contract between Indiana Family and Social Service
27   Administration, Office of Medicaid Policy and Plans and Anthem Insurance
     Companies, Inc. (signed April 5, 2017), at Exhibit 1.C (Scope of Work) ¶ 6.4, at 96.
28   [9] *Id.*
     [10] *Id.*
     [11] *Id.* ¶ 6.6, p. 98.

                                    - 20 -

provider as soon as [the Anthem Defendants have] knowledge that the provider's license or IHCP provider agreement has terminated."[12]

93.    The Anthem Defendants further must have "written credentialing and re-credentialing policies and procedures for ensuring quality of care is maintained or improved and assuring that all contracted providers hold current state licensure and enrollment in the IHCP. [Anthem's] credentialing and re-credentialing process for all contracted providers shall meet the National Committee for Quality Assurance (NCQA) guidelines."[13]

### 3. *Kentucky Medicaid Credentialing Requirements*

94.    Kentucky offers Medicaid through five managed care plans, including one provided by the Anthem Defendants.

95.    As of November 2019, the Anthem Defendants had over 129,436 participants enrolled in its Kentucky managed care plan.

96.    In Kentucky, a managed care organization must "use the forms and guidelines established under KRS 304.17A-545(5) to credential a provider." Ky. Rev. Stat. § 205.560(12)(a). For pharmacies, this requires submission of a complete application and "a valid professional license, registration or certificate" for the provider's field. 907 Ky. Admin. Regs. 1:672.

97.    The Kentucky Division of Medicaid explained to CMS in 2019 that all managed care providers must "have written policies and procedures regarding the selection and retention of their provider network." The Kentucky Division of Medicaid continued:

> All [managed care organization ("MCO")] network providers, including
> individuals and facilities, who will provide health care services must have a
> valid license or, where required, certified to provide health care services in
> the Commonwealth, including certification under CLIA, if applicable. They

---

[12] *Id.*
[13] *Id.*

must also have a valid Drug Enforcement Agency ("DEA") registration number, if applicable. The following providers must be accountable to a formal governing body for review of credentials: physicians, dentists, advanced registered nurse practitioners, vision care and other licensed or certified practitioners. MCOs will be responsible for the ongoing review of provider performance and credentialing.[14]

98.     The Anthem Defendants warranted in their contract with Kentucky from 2015 until 2021 that:

- "Each of the Providers, including individuals and facilities, which will provide health care services in Contractor's Network is validly licensed or, where required, certified to provide those services in the Commonwealth, including certification under CLIA, if applicable."

- "Each Provider in the Contractor's Network has a valid Drug Enforcement Agency ("DEA") registration number, if applicable."

- "Each provider in the Contractor's Network shall have a valid NPI and taxonomy, if applicable."[15]

99.     The Anthem Defendants' contract in Kentucky also provides that they "shall conduct Credentialing and Recredentialing in compliance with National Committee for Quality Assurance standards (NCQA), KRS 205.560(12), 907 KAR 1:672 or other applicable state regulations and federal law."[16]

100.     Appendix J to the Anthem Defendants' Kentucky contract provides a detailed credentialing process that the Anthem Defendants required to follow for

---

[14] Kentucky Cabinet for Health and Family Services Department of Medicaid Services, *Strategy for Assessing and Improving the Quality of Medicaid Managed Care Services*, at 16 (July 23, 2019), *available at* https://chfs.ky.gov/agencies/dms/dpqo/mco-qb/Documents/KY2019QualityStrategy.pdf (last visited July 11, 2021)
[15] Master Agreement Modification between the Kentucky Cabinet for Health and Family Services and the Anthem Kentucky Managed Care Plan Inc. at PDF 15, *available at* https://chfs.ky.gov/agencies/dms/dpqo/Documents/MasterAgreementAnthemExtension.pdf (last visited July 8, 2021).
[16] *Id.* at PDF 101.

- 22 -

their provider network.[17] If the provider loses its license or commits certain other violations, termination of the provider and notice to the Kentucky Division of Medicaid is required.[18]

### 4. *Nevada Medicaid Credentialing Requirements*

101.   Nevada contracts with managed care programs, including one provided by the Anthem Defendants, for the provision of Medicaid. Nev. Rev. Stat. § 422.273. Nevada may contract with a pharmacy benefit manager to direct and coordinate all services related to prescription drugs provided through Medicaid. *Id.* § 422.4053.

102.   In Nevada, any managed care provider must cooperate with an annual state-directed audit and obtain its own annual audit of internal controls to ensure the integrity of its claims processing. *Id.* § 422.4056.

103.   Nevada's Medicaid Services Manual prohibits contracts with providers that do not meet all professional credentialing requirements.[19] Managed care organizations are required to conduct initial and ongoing credentialing and have written policies for monitoring and disciplining network providers.[20]

104.   Nevada's request for proposals for managed care services requires potential contractors to demonstrate that their providers are credentialed.[21]

105.   If a vendor delegates its credentialing obligations, "there must be a written description of the delegated activities, and the delegate's accountability for these activities. There must also be evidence that the delegate accomplished the credentialing activities. The vendor must monitor the effectiveness of the delegate's

---

[17] *Id.* at PDF 217–221.
[18] *Id.* at PDF 110.
[19] Nevada Medicaid Services Manual § 102.12(A)(2) (Aug. 27, 2019).
[20] *Id.* § 3603.21(A)(1) and (B).
[21] Request for Proposal 3260 for Managed Care Organization § 3.4.2.12 (July 1, 2016) (requiring contractors to "demonstrate that its providers are credentialed as required by 42 CFR 438.214 and in this RFP"); *see also, e.g., id.* § 3.7 ("The Vendor shall ensure that its network providers are appropriately credentialed . . . ."); *id.* § 3.10.15 (containing detailed and comprehensive requirements regarding credentialing and recredentialing).

- 23 -

1   credentialing and reappointment or recertification process."[22]

2                  5. *New Jersey Medicaid Credentialing Requirements*

3          106.   New Jersey offers Medicaid primarily through managed care

4   organizations, including the Anthem Defendants.[23]

5          107.   New Jersey's standard managed care contract provides that every

6   managed care organization must have a system to track and report credentialing and

7   recredentialing.[24] The credentialing and recredentialing process must include

8   checking federal databases regarding exclusion lists and ownership and control

9   interests monthly.[25] Additionally, the credentialing process must follow "a

10  systematic and timely approach to the collection and verification of providers'

11  professional qualifications and the assessment of whether the provider meets

12  professional competence and conduct criteria" and require a criminal background

13  check.[26]

14                  6. *New York Medicaid Credentialing Requirements*

15         108.   New York offers Medicaid to needy individuals through managed care

16  plans, including plans offered by the Anthem Defendants. *See* N.Y. Soc. Serv. Law

17  § 364-j.

18         109.   New York requires managed care providers to have "a process for

19  credentialing and recredentialing licensed providers" as part of their quality

20  assurance processes. *Id.* § 364-j(8)(b)(v).

21         110.   In compliance with statutory requirements and federal Medicaid

22  regulations, New York's managed care contracts provide that managed care

---

[22] *Id.* § 3.10.15.7.
[23] New Jersey Department of Human Services, Division of Medical Assistance and & Health Services, NJ Medicaid & Managed Care § 3.3.2(A), https://www.state.nj.us/humanservices/dmahs/info/resources/care/ (last visited July 8, 2021).
[24] New Jersey Department of Human Services, Division of Medical Assistance and & Health Services, Uniform Managed Care Contract, *available at* https://www.state.nj.us/humanservices/dmahs/info/resources/care/hmo-contract.pdf (last visited July 8, 2021).
[25] *Id.*
[26] *Id.* § 4.6.1(C)(5).

- 24 -

1  providers must "have in place a form process, consistent with the SDOH

2  Recommend Guidelines for Credentialing Criteria, for credentialing Participant

3  Providers on a periodic basis (not less than once every three (3) years)[.]"[27] This

4  process includes ensuring "that persons and entities providing care and services for

5  the Contractor in the capacity of physician, dentist, physician assistant, registered

6  nurse, other medical professional or paraprofessional, or other such person or entity

7  satisfy all applicable licensing, certification, or qualification requirements under

8  New York law."[28]

9  ### 7. *Texas Medicaid Credentialing Requirements*

10  111.  The Texas Health and Human Services Commission contracts with

11  managed care providers, including the Anthem Defendants, to provide Medicaid

12  coverage. Tx. Gov. Code §§ 533.002, 533.003.

13  112.  Texas's standard contract for managed care providers requires

14  managed care organizations to "credential Network Providers before they may

15  serve Members."[29] Specifically, a managed care organization must only contract

16  with "a pharmacy provider that meets the MCO's credentialing requirements."[30]

17  "At least once every three years, the MCO must review and approve the credentials

18  of all participating licensed and unlicensed Providers who participate in the MCO's

19  Network."[31]

20  ///

21  ///

22  ///

23  ///

24

---

25  [27] New York Medicaid Managed Care Model Contract (March 1, 2019) § 21.4(a)(i).
   [28] *Id.* § 21.4(b).

26  [29] Texas Health & Human Services Commission, Uniform Managed Care Terms & Conditions § 4.3.5.1, p. 4-53, *available at*

27  https://www.hhs.texas.gov/sites/default/files/documents/services/health/medicaid-chip/programs/contracts/uniform-managed-care-contract.pdf (last visited July 8, 2021).

28  [30] *Id.* § 8.1.4, p. 8-74.
   [31] *Id.* § 8.1.4.4, p. 8-79.

- 25 -

### 8. *Virginia Medicaid Credentialing Requirements*

113.   As of November 2019, ninety percent of enrollees in Virginia Medicaid were covered by private managed care providers, including the Anthem Defendants.[32]

114.   Virginia has two managed care programs, Commonwealth Coordinated Care ("CCC") and Medallion 4.0 ("Medallion").

115.   All managed care organizations in Virginia, including those servicing Medicaid, are required to be licensed. Va. Code § 38.2-5801.

116.   A licensed managed care organizations must "establish and maintain a comprehensive credentialing verification program to ensure its providers meet the minimum standards of professional licensure or certification." 12 Va. Admin. Code § 5-408-170(A). This includes ensuring that providers have a "[c]urrent valid license and history of licensure or certification;" and a "[v]alid DEA certificate." *Id.* Managed care organizations must recredential providers "at least every three years." *Id.* § 5-408-170.

117.   Both CCC and Medallion contracts require that managed care organizations be properly licensed with the state.[33] Additionally, each managed care organization in the Medallion program "must have the ability to determine whether physicians and other health care professionals are licensed by the State and have received proper certification or training to perform medical and clinical services contracted for under this Contract."[34]

///

///

///

---

[32] Virginia Department of Medical Assistance Services, Manage Care 102 Virginia Medicaid Manage Care Delivery Systems, at 6.
[33] CCC Plus MCO Contract for Managed Long-Term Services and Supports ("CCC Contract") § 2.3; Medallion 4.0 Managed Care Services Agreement Contract ("Medallion Contract") § 3.1.
[34] Medallion Contract § 4.1

- 26 -

## DEFENDANTS SUBMITTED AND/OR CAUSED TO BE SUBMITTED BILLIONS OF DOLLARS OF FALSE CLAIMS TO MEDICARE AND MEDICAID

**I.    Defendants' Failure to Properly Credential Network Pharmacies**

**A. Anthem's Expedited 2019 Launch of IngenioRx**

118.   Before launching IngenioRx to provide PBM services to plan participants, Anthem contracted with Express Scripts to provide PBM services, including credentialing and recredentialing of pharmacy providers.

119.   In December 2018, Express Scripts merged with Cigna, one of Anthem's direct competitors.

120.   As a result, Anthem elected to terminate its contract with Express Scripts, and demanded that IngenioRx launch PBM operations for its plans, including government plans, on May 1, 2019, eight months earlier than originally anticipated.

121.   As a wholly owned subsidiary providing PBM services, IngenioRx constitutes a "first-tier" or "related" entity under CMS regulations. 42 C.F.R. § 422.500(b). The other Anthem Defendants retain accountability for all actions of their first-tier, downstream, and/or related entities, including IngenioRx and the CVS Defendants, and have oversight obligations with respect to these first-tier, downstream, and/or related entities. *See* 42 C.F.R. §§ 422.504(i), 423.505(i), 434.6(c).

122.   In the rush to expedite IngenioRx's launch, however, certain corners were cut. One consequence was that although the October 2017 agreement between IngenioRx and CVS (under which IngenioRx delegated PBM services, including credentialing and recredentialing, to CVS) stipulated that IngenioRx would provide oversight of CVS's pharmacy credentialing efforts, the agreement failed to identify a process for CVS's pharmacy credentialing efforts.

///

- 27 -

123.   At the time of IngenioRx's launch on May 1, 2019, IngenioRx had no policy at all for pharmacy credentialing oversight. It was not until the end of 2019 that IngenioRx implemented policies related to pharmacy credentialing oversight.

124.   An additional consequence of the rush to expediate IngenioRx's launch was that executives' roles within IngenioRx were ill-defined. There was particular tension between IngenioRx's compliance and business development personnel.

125.   For example, IngenioRx's network team oversaw contracting and price-setting for all pharmacies in IngenioRx's network – functions designed to generate, and maximize, revenue. However, the same team also oversaw pharmacy audits and credentialing.

126.   This allocation of responsibility posed an obvious, and direct, conflict of interest. Ultimately IngenioRx prioritized the generation of revenue from its pharmacy network at the expense of compliance with Medicare and Medicaid regulations and government contracts.

127.   Indeed, IngenioRx failed to conduct any meaningful oversight of CVS's credentialing and recredentialing processes from the date of IngenioRx's launch on May 1, 2019 until January 2020.

128.   In fact, IngenioRx, with the approval of Vice President Darren Gettings and President Deepti Jain, reached an agreement with the CVS Defendants to only conduct credentialing for pharmacies new to CVS's network, and not for existing pharmacies. Under this agreement, IngenioRx proceeded to add all existing CVS pharmacies to its network without conducting any credentialing.

129.   Further, in 2019, IngenioRx leadership told the CVS Defendants to stop sending credentialing data into Rx Data Central, which was IngenioRx's main reporting system. This data that IngenioRx instructed the CVS Defendants to cease sending included dates on which credentialing was initiated, dates on which credentialing was completed, and other information necessary for IngenioRx and

- 28 -

1   the Anthem Defendants to comply with various Medicare and Medicaid reporting

2   requirements and government contracts. This made it easier to conceal Defendants'

3   credentialing failures.

**B. Ms. Amini's January 2020 Pharmacy Credentialing Audit Uncovers Widespread Credentialing Failures**

6   130.   By the end of 2019, IngenioRx had finally developed a plan for its

7   oversight of the CVS Defendants' pharmacy credentialing process as required by

8   Medicare and Medicaid regulations, government contracts, and the agreement

9   between IngenioRx and the CVS Defendants, but not previously implemented.

10   131.   Under the incipient plan, Ms. Amini would conduct a pharmacy

11   credentialing audit, which would review the credentials of a selection of pharmacies

12   within IngenioRx's network – which the CVS Defendants were responsible for

13   credentialing and recredentialing on IngenioRx's and Anthem's behalf.

14   132.   Per the agreement, Ms. Amini would conduct quarterly audits,

15   selecting thirty pharmacies at her discretion from which she would review

16   credentialing documents, including: pharmacy credentialing applications, base

17   provider agreements, NCPDP[35] verifications, NPI[36] website verifications, DEA

18   verifications, PIC verifications, liability policies, OIG & SAM website

19   verifications, and evidence of monthly OIG & SAM screenings.

20   133.   Ms. Amini initiated the first credentialing audit in January 2020. Ms.

21   Amini selected thirty pharmacies for inclusion in the audit process, including a

22   sampling of retail, clinical, mail order, government, and independent pharmacies.

23   134.   Despite the fact that the audit was to occur in January 2020, the CVS

24   Defendants did not provide any documents in response to the audit until March 20,

---

[35] The National Council for Prescription Drug Programs ("NCPDP") is an ANSI-accredited, not-for-profit membership organization that develops industry standards.

[36] The National Provider Identifier ("NPI") is a number provided by the federal government through the National Plan and Provider Enumeration System ("NPPES").

1    2020. And when the CVS Defendants ultimately did provide documentation, that

2    documentation was woefully deficient and a mere fraction of the documentation

3    that the CVS Defendants had agreed to provide in connection with IngenioRx's

4    pharmacy credentialing oversight obligations. Indeed, for some pharmacies, the

5    CVS Defendants provided no credentialing documentation whatsoever.

6        135.   Ultimately, Ms. Amini determined that 27 of the 30 pharmacies that

7    were a part of her audit were not properly credentialed – 90 percent of the

8    pharmacies audited.

9    **C. Defendants Fail to Remedy the Significant Credentialing Failures**

10       **Uncovered by the January 2020 Pharmacy Credentialing Audit**

11       136.   Ms. Amini immediately notified her supervisor about the January 2020

12   pharmacy credentialing audit's findings. IngenioRx then asked the CVS Defendants

13   to provide an explanation for the significant credentialing failures that Ms. Amini's

14   audit had uncovered.

15       137.   The CVS Defendants were unable to provide any explanation for the

16   widespread pharmacy credentialing failures identified in the audit, and did not

17   provide additional documentation for the audited pharmacies for months. Meetings

18   between IngenioRx and CVS following the audit further revealed that the CVS

19   Defendants had no formal policies or procedures in place for the credentialing and

20   recredentialing of pharmacies required under Medicare and Medicaid regulations

21   and government contracts.

22       138.   Moreover, while the CVS Defendants orally provided IngenioRx with

23   purported "re-credentialing dates" ostensibly indicating that the audited pharmacies

24   had been properly credentialed, they provided no supporting documentation.

25       139.   Then, at a subsequent meeting, the CVS Defendants identified new re-

26   credentialing dates, which were inconsistent with the dates the CVS Defendants had

27   previously provided to IngenioRx, still without any supporting documentation.

28   ///

- 30 -

140.   Based on these inconsistencies, and the CVS Defendants' failure (despite numerous opportunities) to provide the requested pharmacy credentialing documentation, it became clear that the CVS Defendants had failed to properly credential a significant number of pharmacies for which they had credentialing responsibilities.

141.   When confronted with these issues, Ms. Amini's supervisor, IngenioRx Director Raymond Warner, chose to defend the CVS Defendants rather than support Ms. Amini's efforts to provide the oversight required by federal and state regulations and under government contracts.

142.   For example, at one meeting between IngenioRx and the CVS Defendants, Warner, upon learning from the CVS Defendants that several pharmacies in Florida were not properly credentialed, nevertheless told the CVS Defendants that "we need them in our network." The message, from a senior IngenioRx executive (and Ms. Amini's direct supervisor) was clear – keep improperly credentialed pharmacies in IngenioRx's network.

143.   Ms. Amini subsequently learned that multiple members of IngenioRx's leadership team were, in fact, already aware of the CVS Defendants' credentialing failures prior to her January 2020 pharmacy credentialing audit and had taken steps to conceal these failures.

144.   Nonetheless, Defendants' credentialing failures ultimately came to the attention of IngenioRx's Compliance Department. For instance, in July 2020, IngenioRx's Compliance Department emailed Ms. Amini expressing concerns that zero pharmacies had been credentialed in Kentucky. Ms. Amini responded by explaining the results of the audit and by attempting to set up a meeting to discuss the pharmacy credentialing issues identified. The meeting was subsequently canceled by Ms. Amini's supervisor.

145.   IngenioRx's Compliance Department then asked the CVS Defendants to provide data on the number of pharmacies for which credentialing had been

- 31 -

initiated. The CVS Defendants responded that they did not track the data and refused to provide it.

146.  Also in July 2020, IngenioRx's Compliance Department flagged a similar issue in Indiana after the CVS Defendants had provided a pharmacy credentialing report that was incomplete and appeared to include several errors. When the CVS Defendants updated the report, the number of pharmacies allegedly undergoing credentialing jumped from five to two hundred.

147.  Once again, the Compliance Department reached out to Ms. Amini for insight. As part of her efforts to help address the issue, Ms. Amini attempted to obtain access to all the credentialing reports, but IngenioRx refused to provide access. Ms. Amini then asked her supervisor for access to the CVS Defendants' credentialing data through the central data repository (i.e., Rx Data Central) but was again rebuffed.

148.  Ms. Amini subsequently reached out to IngenioRx's Compliance Department to express her serious concerns with the CVS Defendants' credentialing deficiencies and once again offered to meet to discuss the issue further. No such meeting was held.

149.  By August 2020, Ms. Amini had not received sufficient information or documentation to show that the CVS Defendants were properly credentialing their pharmacies. Despite this, Ms. Amini's supervisor advised her to drop the issue and focus on recredentialing only. As a result, Ms. Amini was not permitted to conduct any further credentialing audits.

150.  From May 2019 until October 2020, the Anthem Defendants submitted monthly or periodic requests to the United States and States for capitated payments for their enrollees in Medicare and Medicaid managed care plans. These claims included certifications that they were complying with the contractual terms and Medicare and Medicaid regulations, including the material terms related to credentialing. Based on Defendants' efforts to conceal these credentialing failures,

- 32 -

1   Ms. Amini believes that the Anthem Defendants continued to submit claims falsely

2   certifying compliance with the credentialing provisions after Ms. Amini was

3   terminated from IngenioRx in October 2020.

4          **D. IngenioRx's Retaliation Against Ms. Amini**

5          151.   As a result of Ms. Amini's efforts to ensure compliance with federal

6   and state credentialing and recredentialing regulations and government contracts,

7   Ms. Amini was subjected to retaliation by IngenioRx.

8          152.   When Ms. Amini attempted to recommend a Corrective Action Plan

9   ("CAP") for the CVS Defendants in connection with their pharmacy credentialing

10  failures, her supervisor called her on a personal, blocked phone line and demanded

11  she cease these efforts. Her supervisor threatened her position in the company,

12  noting that it "wouldn't be fun to be laid off during a global pandemic."

13         153.   On June 4, 2020, Ms. Amini was berated by her supervisor and given a

14  verbal warning for her continued insistence that IngenioRx remedy Defendants'

15  pharmacy credentialing failures.

16         154.   After Ms. Amini once again raised the CVS Defendants' pharmacy

17  credentialing failures and IngenioRx's lack of pharmacy credentialing oversight at a

18  July meeting with Anthem, she was issued a written warning. Ms. Amini refuted

19  the written warning in writing, but IngenioRx refused to withdraw it.

20         155.   Soon after the written warning was issued, Ms. Amini reached out to

21  Anthem's Ethics and Compliance leadership to discuss the pharmacy credentialing

22  failures that she had uncovered. She subsequently participated in a meeting with

23  one of Anthem's Ethics Directors and explained what she had uncovered related to

24  the CVS Defendants' failures to properly credential pharmacies and IngenioRx's

25  efforts to suppress this information.

26         156.   On October 2, 2020, IngenioRx terminated Ms. Amini's employment.

27  ///

28  ///

## II.   Defendants' Failure to Report Overpayments to Pharmacies Caused Anthem and/or IngenioRx to Violate Medicare and Medicaid Regulations and the Terms of Government Contracts

157.   In addition to its responsibility for oversight of the CVS Defendants' pharmacy credentialing and recredentialing efforts, IngenioRx was responsible for conducting oversight of the CVS Defendants' "pharmacy audits," which were designed to examine, among other things, whether the CVS Defendants had overpaid pharmacies for services.

158.   Once the CVS Defendants determined they had overpaid a pharmacy, they would send the pharmacy an initial discrepancy notification. However, the CVS Defendants were not concurrently notifying IngenioRx or Anthem of the overpayment discrepancy.

159.   Upon becoming aware of the CVS Defendants' failure to notify IngenioRx and Anthem of pharmacy overpayment discrepancies in 2019, IngenioRx notified the CVS Defendants that they were causing Anthem to violate its obligations under agreements with states that required notification of a overpayment discrepancies prior to an initial discrepancy recovery notice being sent to the provider.

160.   Ultimately, Anthem's Special Investigations Unit ("SIU") determined that a CAP was necessary. As the liaison to Anthem's SIU, Ms. Amini was involved in the development of the CAP.

161.   The CAP went into effect in May 2020 and required the CVS Defendants to (1) create a timeline to notify IngenioRx upon the discovery of an overpayment discrepancy; (2) confirm alignment on contractual requirements for each state and market and develop a checklist to ensure requirements are met; and (3) initiate a process to send copies of recovery notices for all markets, as required.

162.   Additionally, the CVS Defendants were required to update their policies to reflect the processes it created, with specific deadlines put in place for

- 34 -

1    the creation of policy documents.

2        163.   Despite these measures, the CVS Defendants have failed to comply

3    with the terms of the CAP. The CVS Defendants failed to create policies and/or

4    processes to comply with the terms of the CAP. At present, the CVS Defendants

5    are, to the best of Ms. Amini's understanding, still not in compliance with those

6    terms.

7        **COUNT I: FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A)-(B)**

8        164.   Ms. Amini restates and incorporates the allegations contained in the

9    preceding paragraphs.

10       165.   This is a claim for treble damages and penalties under the FCA, 31

11    U.S.C. §§ 3729 et seq. as amended.

12       166.   This Count is asserted against all Defendants.

13       167.   Through the acts described above, Defendants knowingly presented

14    false claims or caused false claims to be presented to the United States for payment

15    or approval.

16       168.   Through the acts described above, Defendants knowingly made, used,

17    or caused to be used false records or statements material to false or fraudulent

18    claims.

19       169.   The Anthem Defendants' contracts with the United States and Qui

20    Tam States, as well as state and federal regulations, required the Anthem

21    Defendants to credential (and recredential) all providers in their managed care

22    plans, including confirming licensing information. The Anthem Defendants

23    subcontracted with IngenioRx to provide PBM services for their contracts with

24    state and federal governments, including credentialing and recredentialing.

25    IngenioRx, in turn, subcontracted with the CVS Defendants to provide pharmacy

26    credentialing and recredentialing services for the Anthem Defendants' plans,

27    including managed care plans for the United States and Qui Tam States.

28    ///

- 35 -

170.   IngenioRx and the CVS Defendants failed to properly implemented a program or process to properly credential and recredential pharmacies and/or ensure that pharmacies were properly licensed.

171.   Consequently, the Anthem Defendants submitted monthly claims for premiums to the United States and the Qui Tam States and falsely certified that the Anthem Defendants were complying with their contractual and regulatory requirements related to credentialing and recredentialing of pharmacy providers.

172.   The United States and the Qui Tam States through Medicare and Medicaid paid substantial sums to the Anthem Defendants despite the fact that the Anthem Defendants, IngenioRx, and the CVS Defendants failed to comply with credentialing and recredentialing requirements for pharmacy providers.

173.   The United States and the Qui Tam States would not have paid the Anthem Defendants' claims if the United States and the Qui Tam States knew that the Anthem Defendants and their delegees were not properly credentialing or recredentialing pharmacy providers.

174.   Because of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

**COUNT II:  REVERSE FALSE CLAIMS, 31 U.S.C. § 3729(A)(1)(G)**

175.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

176.   The Count is against all Defendants.

177.   This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 et seq. as amended.

178.   By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government, and they have concealed and

- 36 -

improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicare, Medicaid, and other government health care program claims to which Defendants knew they were not entitled and therefore refunds were properly due and owing to the United States.

179.   The United States and the Qui Tam States, unaware of Defendants' concealment, have not made a demand for or collected the overpayments due from Defendants.

180.   Because of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT III: CONSPIRING TO COMMIT VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(C)

181.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

182.   This Count is asserted against Defendants IngenioRx and the CVS Defendants.

183.   This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 et seq. as amended.

184.   Defendants conspired together and with others to commit violations of 31 U.S.C. § 3729(a)(1)(A) and (B).

185.   The Government, unaware of the conspiracies and of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid, and continues to pay, claims that would not be paid but for Defendants' illegal conduct.

186.   Because of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

- 37 -

1   Additionally, the United States is entitled to the maximum statutory penalty for

2   each and every violation alleged herein.

3   **COUNT IV: CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE §**

4   **12651(A)(1) AND (2)**

5   187.   Ms. Amini restates and incorporates the allegations contained in the

6   preceding paragraphs.

7   188.   This is a claim for treble damages and penalties under the California

8   FCA, Cal. Gov't Code § 12651(a)(1) and (2).

9   189.   This Count is asserted against Defendants Anthem, Blue Cross of

10   California, IngenioRx, and the CVS Defendants.

11   190.   Through the acts described above, Defendants knowingly presented

12   false claims or caused false claims to be presented to California for payment or

13   approval.

14   191.   Through the acts described above, Defendants knowingly made, used,

15   or caused to be used false records or statements material to false or fraudulent

16   claims.

17   192.   Blue Cross of California's contracts with California, as well as state

18   and federal regulations, required it to credential all providers in its managed care

19   plans, including confirming licensing information. Blue Cross of California,

20   through Anthem, subcontracted with IngenioRx to provide PBM services for its

21   contracts with California, including credentialing and recredentialing. IngenioRx

22   subcontracted with the CVS Defendants to provide credentialing and

23   recredentialing services for pharmacies for the Anthem Defendants' insurance

24   plans, including the managed care plans for California.

25   193.   Anthem, IngenioRx, and the CVS Defendants never properly

26   credentialed or implemented a program or process for credentialing and

27   recredentialing pharmacies and/or ensuring that pharmacies are properly licensed.

28   As a result, numerous pharmacies were not properly credentialed or recredentialed.

- 38 -

194.   Blue Cross Blue Shield of California submitted monthly claims for premiums to California that falsely certified that Blue Cross Blue Shield of California was complying with the contractual and regulatory requirements related to credentialing and recredentialing.

195.   California, using state funds, through Medicaid, paid substantial sums to Blue Cross Blue Shield of California when it and Defendants, as subcontractors, failed to properly implement a program or process for credentialing and recredentialing pharmacies and/or ensuring that pharmacies are properly licensed, resulting in numerous pharmacies not being properly credentialed or recredentialed.

196.   California would not have paid Blue Cross Blue Shield of California claims if it knew it was not properly credentialing and recredentialed pharmacy providers.

197.   Because of Defendants' acts, California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, California is entitled to the maximum statutory penalty for each and every violation alleged herein.

**COUNT V: CONSPIRING TO COMMIT VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE § 12651(A)(3)**

198.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

199.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code § 12651(a)(3).

200.   This Count is asserted against Defendants IngenioRx and the CVS Defendants.

201.   By and through the acts described above, one or more of the Defendants conspired together or with others to commit violations of Cal. Gov't Code § 12651(a)(1) and (2).

///

- 39 -

202.   California, unaware of the conspiracy and of the falsity of the records, statements, and claims made or caused to be made by Defendants IngenioRx and the CVS Defendants, has paid, and continues to pay, claims that would not be paid but for Defendants' illegal conduct.

203.   Because of Defendants' acts, California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, California is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT VI: INDIANA MEDICAID FALSE CLAIMS ACT, IND. CODE § 5-11-5.7-2(1) AND (2)

204.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

205.   This is a claim for treble damages and penalties under the Indiana False Claims Act, Ind. Code § 5-11-5.7-2(1) and (2).

206.   This Count is asserted against Defendants Anthem, Anthem Insurance Co., Inc., IngenioRx, and the CVS Defendants.

207.   Through the acts described above, Defendants Anthem, Anthem Insurance Co., Inc., IngenioRx, and the CVS Defendants knowingly presented false claims or caused false claims to be presented to Indiana for payment or approval.

208.   Through the acts described above, Defendants Anthem, Anthem Insurance Co., Inc., IngenioRx, and the CVS Defendants knowingly made, used, or caused to be used false records or statements material to false or fraudulent claims.

209.   Anthem Insurance Co.'s contracts with Indiana, as well as state and federal regulations, required it to credential and recredential all providers in its managed care plans, including by confirming licensing information. Anthem Insurance Co., through Anthem, subcontracted with IngenioRx to provide PBM services for its contracts with Indiana, including credentialing and recredentialing. IngenioRx subcontracted with the CVS Defendants to provide pharmacy

- 40 -

1   credentialing and recredentialing services for the Anthem Defendants' insurance
2   plans, including the managed care plans for Indiana.

3       210.   Anthem, IngenioRx, and the CVS Defendants never properly
4   implemented a program or process for credentialing and recredentialing pharmacies
5   and/or ensuring that pharmacies are properly licensed. As a result, numerous
6   pharmacies were not properly credentialed or recredentialed.

7       211.   Anthem Insurance Co. submitted monthly claims for premiums to
8   Indiana that falsely certified that it was complying with contractual and regulatory
9   requirements related to credentialing and recredentialing.

10      212.   Indiana, using state funds, through Medicaid, paid substantial sums to
11  Anthem Insurance Co. when it and Defendants IngenioRx and the CVS Defendants,
12  as subcontractors, failed to comply with credentialing and recredentialing
13  requirements for pharmacy providers.

14      213.   Indiana would not have paid Anthem Insurance Co.'s claims if it knew
15  Anthem Insurance Co. was not properly credentialing and recredentialing pharmacy
16  providers.

17      214.   Because of Defendants Anthem, Anthem Insurance Co., Inc.,
18  IngenioRx, and the CVS Defendants' acts, Indiana has been damaged, and
19  continues to be damaged, in a substantial amount to be determined at trial.
20  Additionally, Indiana is entitled to the maximum statutory penalty for each and
21  every violation alleged herein.

22  **COUNT VII: CONSPIRING TO COMMIT VIOLATIONS OF THE**
23  **INDIANA MEDICAID FALSE CLAIMS ACT, IND. CODE § 5-11-5.7-2(7)**

24      215.   Ms. Amini restates and incorporates the allegations contained in the
25  preceding paragraphs.

26      216.   This is a claim for treble damages and penalties under the Indiana
27  False Claims Act, Ind. Code § 5-11-5.7-2(7).

28  ///

1       217.   This Count is asserted against Defendants IngenioRx and the CVS

2   Defendants.

3       218.   By and through the acts described above, one or more of Defendants

4   conspired together or with others to commit violations of Indiana False Claims Act,

5   Ind. Code § 5-11-5.7-2(1) and (2).

6       219.   Indiana, unaware of the conspiracy and of the falsity of the records,

7   statements, and claims made or caused to be made by Defendants IngenioRx and

8   the CVS Defendants, has paid, and continues to pay claims that would not be paid

9   but for Defendants' illegal conduct.

10       220.   Because of Defendants' acts, Indiana has been damaged, and continues

11   to be damaged, in a substantial amount to be determined at trial. Additionally,

12   Indiana is entitled to the maximum statutory penalty for each and every violation

13   alleged herein.

14   **COUNT VIII: NEVADA FALSE CLAIMS ACT, NEV. REV. STAT. §§**

15   **357.040(1)(A) AND (B)**

16       221.   Ms. Amini restates and incorporates the allegations contained in the

17   preceding paragraphs.

18       222.   This is a claim for treble damages and penalties under Nevada False

19   Claims Act, Nev. Rev. Stat. § 357.040(1)(a) and (b).

20       223.   This Count is asserted against Defendants Anthem, Community Care

21   Health Plan of Nevada, Inc., IngenioRx, and the CVS Defendants.

22       224.   Through the acts described above, Defendants Anthem, Community

23   Care Health Plan of Nevada, Inc., IngenioRx, and the CVS Defendants knowingly

24   presented false claims or caused false claims to be presented to Nevada for payment

25   or approval.

26       225.   Through the acts described above, Defendants Anthem, Community

27   Care Health Plan of Nevada, Inc., IngenioRx, and the CVS Defendants knowingly

28   made, used, or caused to be used false records or statements material to false or

- 42 -

1    fraudulent claims.

2          226.   Community Care Health Plan of Nevada, Inc.'s contracts with Nevada,

3    as well as state and federal regulations, required it to credential and recredential all

4    providers in its managed care plans, including by confirming licensing information.

5    Community Care Health Plan of Nevada, Inc., through Anthem, subcontracted with

6    IngenioRx to provide PBM services for its contracts with Nevada, including

7    credentialing and recredentialing. IngenioRx subcontracted with the CVS

8    Defendants to provide pharmacy credentialing and recredentialing services for

9    pharmacies for the Anthem Defendants' insurance plans, including the managed

10   care plans for Nevada.

11         227.   Anthem, IngenioRx, and the CVS Defendants never properly

12   implemented a program or process for credentialing and recredentialing pharmacies

13   and/or ensuring that pharmacies are properly licensed. As a result, numerous

14   pharmacies were not properly credentialed or recredentialed.

15         228.   Community Care Health Plan of Nevada, Inc. submitted monthly

16   claims for premiums to Nevada that falsely certified that it was complying with the

17   contractual and regulatory requirements for credentialing and recredentialing.

18         229.   Nevada, using state funds, through Medicaid, paid substantial sums to

19   Community Care Health Plan of Nevada, Inc. when it and Defendants IngenioRx

20   and the CVS Defendants, as subcontractors, failed to comply with credentialing and

21   recredentialing requirements for pharmacy providers.

22         230.   Nevada would not have paid Community Care Health Plan of Nevada,

23   Inc.'s claims if it knew Community Care Health Plan of Nevada, Inc was not

24   properly credentialing and recredentialing pharmacy providers.

25         231.   Because of Defendants' acts, Nevada has been damaged, and continues

26   to be damaged, in a substantial amount to be determined at trial. Additionally,

27   Nevada is entitled to the maximum statutory penalty for each and every violation

28   alleged herein.

**COUNT IX: CONSPIRING TO COMMIT VIOLATIONS OF THE NEVADA FALSE CLAIMS ACT, NEV. REV. STAT. § 357.040(1)(I)**

232.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

233.   This is a claim for treble damages and penalties under the Nevada False Claims Act, Nevada Rev. Stat. § 357.040(1)(i).

234.   This Count is asserted against Defendants IngenioRx and the CVS Defendants.

235.   By and through the acts described above, one or more of Defendants conspired together or with others to commit violations of the Nevada False Claims Act, Nevada Rev. Stat. § 357.040(1)(a) and (b).

236.   Nevada, unaware of the conspiracy and of the falsity of the records, statements, and claims made or caused to be made by Defendants IngenioRx and the CVS Defendants, has paid, and continues to pay, claims that would not be paid but for Defendants' illegal conduct.

237.   Because of Defendants IngenioRx and the CVS Defendants' acts, Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, Nevada is entitled to the maximum statutory penalty for each and every violation alleged herein.

**COUNT X: NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. ANN. §§ 2A:32C-3(A) AND (B)**

238.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

239.   This is a claim for treble damages and penalties under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-3(a) and (b).

240.   This Count is asserted against Defendants Anthem, Amerigroup New Jersey, Inc., IngenioRx, and the CVS Defendants.

///

- 44 -

241.   Through the acts described above, Defendants knowingly presented false claims or caused false claims to be presented to New Jersey for payment or approval.

242.   Through the acts described above, Defendants knowingly made, used, or caused to be used false records or statements material to false or fraudulent claims.

243.   Amerigroup New Jersey, Inc.'s contracts with New Jersey, as well as state and federal regulations, required it to credential and recredential all providers in its managed care plans, including by confirming licensing information. Amerigroup New Jersey, Inc., through Anthem, subcontracted with IngenioRx to provide PBM services for its contracts with New Jersey, including credentialing and recredentialing. IngenioRx subcontracted with the CVS Defendants to provide the pharmacy credentialing and recredentialing services for the Anthem Defendants' insurance plans, including the managed care plans for New Jersey.

244.   Anthem, IngenioRx, and the CVS Defendants never properly implemented a program or process for credentialing and recredentialing pharmacies and/or ensuring that pharmacies are properly licensed. As a result, numerous pharmacies were not properly credentialed or recredentialed.

245.   Amerigroup New Jersey, Inc., submitted monthly claims for premiums to New Jersey that falsely certified that it was complying with the contractual and regulatory requirements related to credentialing and recredentialing.

246.   New Jersey, using state funds, through Medicaid, paid substantial sums to Amerigroup New Jersey, Inc., when it and Defendants IngenioRx and the CVS Defendants, as subcontractors, failed to comply with credentialing and recredentialing requirements for pharmacy providers.

247.   New Jersey would not have paid Amerigroup New Jersey, Inc.'s claims if it knew Amerigroup New Jersey, Inc. was not properly credentialing and recredentialing pharmacy providers.

- 45 -

SEALED COMPLAINT

248.   Because of Defendants Anthem, Amerigroup New Jersey, Inc., IngenioRx, and the CVS Defendants' acts, New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, New Jersey is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT XI: NEW JERSEY REVERSE FALSE CLAIM, N.J. STAT. ANN. § 2A:32C-3(G)

249.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

250.   This is a claim for treble damages and penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-3(g).

251.   The Count is against Defendants Anthem, Amerigroup New Jersey, Inc., IngenioRx, and the CVS Defendants.

252.   Through the acts described above, Defendants Anthem, Amerigroup New Jersey, Inc., IngenioRx, and the CVS Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the New Jersey, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims to which the above-referenced Defendants knew they were not entitled, and therefore refunds were properly due and owing to New Jersey.

253.   New Jersey, unaware of the concealment by Defendants Anthem, Amerigroup New Jersey, Inc., IngenioRx, and the CVS Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

254.   Because of Defendants Anthem, Amerigroup New Jersey, Inc., IngenioRx, and the CVS Defendants' acts, New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, New Jersey is entitled to the maximum penalty of up to for each and every violation alleged herein.

- 46 -

**COUNT XII: CONSPIRING TO COMMIT VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. ANN. § 2A:32C-3(C)**

255.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

256.   This is a claim for treble damages and penalties under the New Jersey FCA, N.J. Stat. Ann. §§ 2A:32C-3(c).

257.   This Count is asserted against Defendants IngenioRx and the CVS Defendants.

258.   By and through the acts described above, one or more of Defendants conspired together or with others to commit violations of the New Jersey FCA, N.J. Stat. Ann. §§ 2A:32C-3(a) and (b).

259.   New Jersey, unaware of the conspiracy and of the falsity of the records, statements, and claims made or caused to be made by Defendants IngenioRx and the CVS Defendants, has paid, and continues to pay, claims that would not be paid but for Defendants' illegal conduct.

260.   Because of Defendants IngenioRx and the CVS Defendants' acts, New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, New Jersey is entitled to the maximum statutory penalty for each and every violation alleged herein.

**COUNT XIII: NEW YORK FALSE CLAIMS ACT, N.Y. STATE FIN. LAW §§ 189(1)(A) AND (B)**

261.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

262.   This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. State Fin. Law §§ 189(1)(a) and (b).

263.   This Count is asserted against Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants.

- 47 -

264. Through the acts described above, Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants knowingly presented false claims or caused false claims to be presented to the New York for payment or approval.

265. Through the acts described above, Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants knowingly made, used, or caused to be used false records or statements material to false or fraudulent claims.

266. Empire HealthChoice HMO, Inc. and HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus contracts with New York, as well as state and federal regulations, required it to credential and recredential all providers in its managed care plans, including by confirming licensing information. Empire HealthChoice HMO, Inc. and HealthPlus HP, LLC, through Anthem, subcontracted with IngenioRx to provide PBM services for its contracts with New York, including credentialing and recredentialing. IngenioRx subcontracted with the CVS Defendants to provide pharmacy credentialing and recredentialing services for the Anthem Defendants' insurance plans, including the managed care plans for New York.

267. Anthem, IngenioRx, and the CVS Defendants never properly implemented a program or process for credentialing and recredentialing pharmacies and/or ensuring that pharmacies are properly licensed. As a result, numerous pharmacies were not properly credentialed or recredentialed.

268. Empire HealthChoice HMO, Inc. and HealthPlus HP, LLC submitted monthly claims for premiums to New York that falsely certified that they were complying with the contractual and regulatory requirements related to credentialing and recredentialing.

- 48 -

269.   New York, using state funds, through Medicaid, paid substantial sums to Empire HealthChoice HMO, Inc. and HealthPlus HP, LLC when they and Defendants IngenioRx and the CVS Defendants, as subcontractors, failed to comply with credentialing and recredentialing requirements for pharmacy providers.

270.   New York would not have paid Empire HealthChoice HMO, Inc. and HealthPlus HP, LLC's claims if it knew Empire HealthChoice HMO, Inc. and HealthPlus HP, LLC were not properly credentialing and recredentialing pharmacy providers.

271.   Because of Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants' acts, New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, New York is entitled to the maximum statutory penalty for each and every violation alleged herein.

**COUNT XIV: NEW YORK REVERSE FALSE CLAIMS, N.Y. STATE FIN. LAW § § 189.1(G)-(H)**

272.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

273.   This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. State Fin. § 189.1(g)-(h).

274.   This claim is against Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants.

275.   Through the acts described above, Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the New York and they have concealed and improperly

- 49 -

avoided an obligation to pay money to New York, including specifically the above-referenced Defendants' obligation to report and repay past overpayments of Medicaid claims to which the above-referenced Defendants knew they were not entitled and therefore refunds were properly due and owing to New York.

276. New York, unaware of the concealment by the above-referenced Defendants, has not made demand for or collected the years of overpayments due from the above-referenced Defendants.

277. Because of Defendants Anthem, Empire HealthChoice HMO, Inc., HealthPlus HP, LLC, d/b/a Empire Blue cross BlueShield Health Plus, IngenioRx, and the CVS Defendants' acts, New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, New York is entitled to the maximum penalty of up to for each and every violation alleged herein.

**COUNT XV: CONSPIRING TO COMMIT VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT, N.Y. STATE FIN. LAW §§ 189(1)(C)**

278. Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

279. This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. State Fin. Law §189(1)(c).

280. This Count is asserted against Defendants IngenioRx and the CVS Defendants.

281. By and through the acts described above, one or more of Defendants conspired together or with others to commit violations of the New York False Claims Act, N.Y. State Fin. Law §§ 189(1)(a) and (b).

282. New York, unaware of the conspiracy and of the falsity of the records, statements, and claims made or caused to be made by Defendants IngenioRx and the CVS Defendants, has paid, and continues to pay, claims that would not be paid but for Defendants' illegal conduct.

- 50 -

283.   Because of Defendants' acts, New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, New York is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT XVI: TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE §§ 36.002(1), (4) AND (6)

284.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

285.   This is a claim for treble damages and penalties under the Texas False Claims Act, Tex. Hum. Res. Code §§ 36.002(1), (4) and (6).

286.   This Count is asserted against Defendants Anthem, Amerigroup Texas, Inc., IngenioRx, and the CVS Defendants.

287.   Through the acts described above, Defendants Anthem, Amerigroup Texas, Inc., IngenioRx, and the CVS Defendants knowingly presented false claims or caused false claims to be presented to Texas for payment or approval.

288.   Through the acts described above, Defendants Anthem, Amerigroup Texas, Inc., IngenioRx, and the CVS Defendants knowingly made, used, or caused to be used false records or statements material to false or fraudulent claims.

289.   Amerigroup Texas, Inc.'s contracts with Texas, as well as state and federal regulations, required it to credential and recredential all providers in its managed care plans, including by confirming licensing information. Amerigroup Texas, Inc., through Anthem, subcontracted with IngenioRx to provide PBM services for its contracts with Texas, including credentialing and recredentialing. IngenioRx subcontracted with the CVS Defendants to provide pharmacy credentialing and recredentialing services for the Anthem Defendants' insurance plans, including the managed care plans for Texas.

290.   Anthem, IngenioRx, and the CVS Defendants never properly implemented a program or process for credentialing and recredentialing pharmacies

- 51 -

and/or ensuring that pharmacies are properly licensed. As a result, numerous pharmacies were not properly credentialed or recredentialed.

291.   Amerigroup Texas, Inc., submitted monthly claims for premiums to Texas that falsely certified that it was complying with the contractual and regulatory requirements related to credentialing and recredentialing.

292.   Texas, using state funds, through Medicaid, paid substantial sums to Amerigroup Texas, Inc., when it and Defendants IngenioRx and the CVS Defendants, as subcontractors, failed to comply with credentialing and recredentialing requirements for pharmacy providers.

293.   Texas would not have paid Amerigroup Texas, Inc.'s claims if it knew Amerigroup Texas, Inc. was not properly credentialing and recredentialing pharmacy providers.

294.   Because of Defendants Anthem, Amerigroup Texas, Inc., IngenioRx, and the CVS Defendants' acts, Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, Texas is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT XVII: FAILURE TO DISCLOSE REQUIRED INFORMATION UNDER THE TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE § 36.002(10)(B)

295.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

296.   This is a claim for treble damages and penalties under the Texas False Claims Act, Tex. Hum. Res. Code §§ 36.002(1), (4) and (6).

297.   This Count is asserted against Defendants Anthem, Amerigroup Texas, Inc., IngenioRx, and the CVS Defendants.

298.   Through the acts described above, the above-referenced Defendants failed to provide to the Texas Health and Human Services reports and documents

1   regarding SIU investigations and reports of acts of waste fraud and abuse, as

2   required by law. *See* Tex. Admin. Code § 353.502(c)(5)(D)(i).

3       299.   Texas, unaware of the concealment by Defendants Anthem,

4   Amerigroup Texas, Inc., IngenioRx, and the CVS Defendants, has not made

5   demand for or collected the years of overpayments due from the above-referenced

6   Defendants.

7       300.   Because of Defendants Anthem, Amerigroup Texas, Inc., IngenioRx,

8   and the CVS Defendants' acts, Texas has been damaged, and continues to be

9   damaged, in a substantial amount to be determined at trial. Additionally, Texas is

10  entitled to the maximum penalty of up to for each and every violation alleged

11  herein.

12  **COUNT XVIII: CONSPIRING TO COMMIT VIOLATIONS OF THE**

13  **TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE**

14  **§ 36.002(9)**

15      301.   Ms. Amini restates and incorporates the allegations contained in the

16  preceding paragraphs.

17      302.   This is a claim for treble damages and penalties under the Texas False

18  Claims Act, Tex. Hum. Res. Code § 36.002(9).

19      303.   This Count is asserted against Defendants IngenioRx and the CVS

20  Defendants.

21      304.   By and through the acts described above, one or more of Defendants

22  conspired together or with others to commit violations of the Texas False Claims

23  Act, Tex. Hum. Res. Code §§ 36.002(1), (4) and (6).

24      305.   Texas, unaware of the conspiracy and of the falsity of the records,

25  statements, and claims made or caused to be made by Defendants IngenioRx and

26  the CVS Defendants, has paid, and continues to pay, claims that would not be paid

27  but for Defendants' illegal conduct.

28  ///

- 53 -

306.    Because of Defendants IngenioRx and the CVS Defendants' acts, Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, Texas is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT XIX: VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE §§ 8.01-216.3(A)(1) AND (2)

307.    Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

308.    This is a claim for treble damages and penalties under the Virginia False Claims Act, Va. Code § 8.01-216.3(A)(1) and (2).

309.    This Count is asserted against Defendants Anthem, HealthKeepers, Inc., IngenioRx, and the CVS Defendants.

310.    Through the acts described above, Defendants Anthem, HealthKeepers, Inc., IngenioRx, and the CVS Defendants knowingly presented false claims or caused false claims to be presented to Virginia for payment or approval.

311.    Through the acts described above, Defendants Anthem, HealthKeepers, Inc., IngenioRx, and the CVS Defendants knowingly made, used, or caused to be used false records or statements material to false or fraudulent claims.

312.    HealthKeepers, Inc.'s contracts with Virginia, as well as state and federal regulations, required it to credential and recredential all providers in its managed care plans, including by confirming licensing information. HealthKeepers, Inc., through Anthem, subcontracted with IngenioRx to provide PBM services for its contracts with Virginia, including credentialing and recredentialing. IngenioRx subcontracted with the CVS Defendants to provide pharmacy credentialing and recredentialing services for the Anthem Defendants' insurance plans, including the managed care plans for Virginia.

- 54 -

313.   Anthem, IngenioRx, and the CVS Defendants never properly implemented a program or process for credentialing and recredentialing pharmacies and/or ensuring that pharmacies are properly licensed. As a result, numerous pharmacies were not properly credentialed or recredentialed.

314.   HealthKeepers, Inc. submitted monthly claims for premiums to the Virginia that falsely certified that it was complying with the contractual and regulatory requirements related to credentialing and recredentialing.

315.   Virginia, using state funds, through Medicaid, paid substantial sums to HealthKeepers, Inc. when it and Defendants IngenioRx and the CVS Defendants, as subcontractors, failed to comply with credentialing and recredentialing requirements for pharmacy providers.

316.   Virginia would not have paid HealthKeepers, Inc.'s claims if it knew HealthKeepers, Inc. was not properly credentialing and recredentialing pharmacy providers.

317.   Because of Defendants Anthem, HealthKeepers, Inc., IngenioRx, and the CVS Defendants' acts, Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, Virginia is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT XX: CONSPIRING TO COMMIT VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA CODE § 8.01-216.3(A)(3)

318.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

319.   This is a claim for treble damages and penalties under the Virginia False Claims Act, Va. Code § 8.01-216.3(A)(3).

320.   This Count is asserted against Defendants IngenioRx and the CVS Defendants.

- 55 -

321.   By and through the acts described above, one or more of Defendants conspired together or with others to commit violations of the Virginia False Claims Act, Va. Code §§ 8.01-216.3(A)(1) and (2).

322.   Virginia, unaware of the conspiracy and of the falsity of the records, statements, and claims made or caused to be made by Defendants IngenioRx and the CVS Defendants, has paid, and continues to pay, claims that would not be paid but for Defendants' illegal conduct.

323.   Because of Defendants IngenioRx and the CVS Defendants' acts, Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, Virginia is entitled to the maximum statutory penalty for each and every violation alleged herein.

## COUNT XXI: RETALIATORY DISCHARGE FOR REPORTING VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(H)

324.   Ms. Amini restates and incorporates the allegations contained in the preceding paragraphs.

325.   This is a claim for retaliatory discharge under the FCA, 31 U.S.C. § 3730(h).

326.   Ms. Amini brings this Count in her personal capacity against Defendants Anthem and IngenioRx.

327.   As alleged above, Ms. Amini reported the CVS Defendants' failure to properly credential IngenioRx network pharmacies internally within IngenioRx and Anthem beginning in January 2020.

328.   As a result of her reporting of IngenioRx's failure to comply with the terms of government contracts, Ms. Amini was discriminated against, threatened, and harassed by her supervisors at IngenioRx.

329.   Ultimately, in October 2020, Ms. Amini was terminated from IngenioRx because of her internal reporting of FCA violations.

///

- 56 -

330.   Pursuant to 31 U.S.C. § 3730(h)(2) Amini is entitled to two times her back pay. Ms. Amini is also entitled to interest on her backpay, attorneys' fees, and costs from Anthem and IngenioRx, in addition to all special damages and other damages that may be available.

**JURY TRIAL DEMANDED**

331.   Under Fed. R. Civ. P. 38 and the Constitution of the United States, Ms. Amini demands a trial by jury.

**PRAYER FOR RELIEF**

For these reasons, Ms. Amini, on behalf of the United States and the Qui Tam States, respectfully requests:

- That Defendants are enjoined from violating the FCA, 31 U.S.C. §§ 3729 et seq. and the state false claims acts referenced herein;

- That judgments be entered against Defendants and in favor of the United States, the Qui Tam States, and Ms. Amini in an amount equal to three times the amount of damages caused by Defendants' misconduct, as well as a civil penalty for each FCA violation, or comparable violation of a state false claims act, in the maximum statutory amount;

- That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

- That judgment be granted for Ms. Amini against Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees permitted under 31 U.S.C. § 3730(d), and comparable provisions of the state false claims acts;

- That Ms. Amini be awarded the maximum amount permitted under 31 U.S.C. § 3730(d), and comparable provisions of the state false claims acts;

- That Ms. Amini be awarded two times back pay under the FCA,

- 57 -

1    interest on her backpay, attorneys' fees, costs, and all special damages

2    and other damages that may be available under 31 U.S.C.

3    § 3730(h)(2); and

4    •   That the Court award such other relief as the Court deems proper.

5

6    July 14, 2021                          Respectfully submitted,

7

8                                           SCHLICHTER, BOGARD & DENTON LLP
9                                           Steven Luther (SBN 266570)
                                            Andrew D. Schlichter (pro hac vice forthcoming)
10                                          Joel D. Rohlf (pro hac vice forthcoming)
                                            100 South Fourth Street, Suite 1200
11                                          St. Louis, Missouri 63102
12                                          Telephone: (314) 621-6115
                                            Facsimile: (314) 621-5934
13                                          sluther@uselaws.com
14                                          aschlichter@uselaws.com
                                            jrohlf@uselaws.com
15                                          *Counsel for Relator-Plaintiff Mahnaz Amini*

16

17

18

19

20

21

22

23

24

25

26

27

28

- 58 -

SEALED COMPLAINT



ORIGIN ID:CPSA    (314) 621-6115
REBEKAH FREISINGER
SCHLICHTER BOGARD & DENTON
100 S. 4TH ST., STE. 1200

ST. LOUIS, MO 63102
UNITED STATES US

SHIP DATE: 13JUL21
ACTWGT: 1.00 LB
CAD: 104771289/INET4340

BILL SENDER

TO  CLERK OF THE COURT - INTAKES
CENTRAL DISTRICT OF CALIFORNIA
350 W. 1ST STREET, STE. 4311

LOS ANGELES CA 90012
(213) 894-1565        REF: 202651
INV:
PO:              DEPT:

FedEx
Express

E

WED - 14 JUL 10:30A
PRIORITY OVERNIGHT

TRK#
0201   7742 4846 6451

FedEx
TRK#
0201   7742 4846 6451

XH EMTA

THU - 15 JUL AA
PRIORITY OVERNIGHT

90012
CA-US
LAX